# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REX INVESTMENT COMPANY LTD, a California corporation,<br><br>                              Plaintiff,<br><br>v.<br><br>S.M.E., INC., a dissolved Nebraska corporation; SHENNEN SALTZMAN, individually; THEODORE SALTZMAN, JR., individually; and DOES 1-20,<br><br>                             Defendants. | Case No.: 3:15-cv-02607-H-JMA<br><br>**ORDER**<br><br>**(1) DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**(2) GRANTING SUMMARY JUDGMENT TO DEFENDANTS**<br><br>[Doc. No. 43.] |

On September 12, 2017, Plaintiff Rex Investment Company Ltd ("Rex") filed a motion for partial summary judgment. (Doc. No. 43.) On October 10, 2017, Defendant S.M.E., Inc. ("SME") filed an opposition to the motion. (Doc. No. 47.) On October 13, 2017, the Court gave notice that it may construe SME's opposition as a cross motion for summary judgment on each of Rex's remaining claims based on <u>BRE DDR BR Whittwood CA LLC v. Farmers & Merchants Bank of Long Beach</u>, 14 Cal. App. 5th 992 (2017), a decision from the California Court of Appeal issued on August 29, 2017. (Doc. No. 48.) On October 16, 2017, Rex filed a reply, in which it addressed <u>BRE DDR BR</u> and attempted to distinguish the case on its facts. (Doc. No. 49.) The Court held a hearing on the motion

on October 23, 2017. Richard S. Davis appeared for Rex. Patrick Joseph D'Arcy and James Lee appeared for SME. For the reasons below, the Court denies the motion. Because there are no disputed material facts which, if resolved in Rex's favor, would permit Rex to prevail on any of its claims at trial, the Court enters summary judgment for SME.

## Background

**I. Factual History**

This diversity action presents the question of whether a company that is not on a commercial real estate lease but occupies the premises is bound by the lease after it ceases occupying the leased property. Rex, the lessor in this case, argues that equitable principles should bind SME, a company that occupied Rex's property from at least the mid-1990s until 2012, but never signed a lease with Rex, to a lease agreement that Rex signed with non-party Northeast Nebraska Development, Inc. ("NE Nebraska"). Invoking BRE DDR BR Whittwood CA LLC v. Farmers & Merchants Bank of Long Beach, 14 Cal. App. 5th 992 (2017), SME argues that any obligations it had to Rex ended when it vacated Rex's property in 2012. Because California case law clearly holds that an assignee's "obligations terminate when the assignee terminates his possession" of the lessor's property, unless the assignee expressly assumes the lease, id. at 1000 (quotation marks omitted), the Court agrees with Rex.

On June 5, 1985, Rex entered into a commercial lease agreement ("1985 Lease Agreement" or "Lease Agreement") with NE Nebraska, wherein Rex agreed to lease the commercial building located at 610 Imperial Avenue in Calexico, California ("Calexico property") to NE Nebraska for the purpose of operating a Burger King restaurant. (Doc. No. 43-3, Rex's Statement of Undisputed Material Facts, ¶ 1.) The lease agreement commenced on December 5, 1985 and provided for an original term of twenty years with two optional five-year extensions. (Id.)

At some point during the period of the original lease term, SME took possession of

the Calexico property began operating a Burger King restaurant.[1] (Doc. No. 46, SME's Statement of Undisputed Material Facts, ¶ 16.) After SME took possession of the property, it paid rent to Rex, paid all relevant property taxes, made repairs to the property as needed, and maintained liability insurance as required by the Lease Agreement. (Id. ¶¶ 19–23.)

Upon expiration of the lease agreement's original 20-year term, on December 5, 2005, SME exercised the first five-year extension, including an increase in the rental payments due under the lease. (Doc. No. 16, FAC, ¶ 11.) And upon expiration of that term, on December 5, 2010, SME exercised the second five-year extension, including an additional increase in the rental payments due under the lease. (Id. ¶ 12.)

On January 6, 2012, SME solid its interest in the Burger King franchise to non-party Calexico Group, Inc. (Doc. No. 46 ¶ 33.) Sometime later that year, SME vacated the Calexico property.[2] (Doc. No. 16 ¶¶ 50, 69–70.) Rex continued to receive rent from non-parties S.M.E., Inc., Burger King, Yuma, AZ and Shen-Dae-Man Properties, LLC—companies that Rex believes are affiliates of SME—until May 2014. (Doc. No. 43-7 at PageID 892–900.)

On December 20, 2012, SME filed articles of dissolution with the Nebraska Secretary of State. (Doc. No. 43-3 ¶ 34.) Plaintiff alleges that at the time of its dissolution, SME had outstanding obligations to Plaintiff under the lease agreement. (Doc. No. 16 ¶ 78.)

Plaintiff alleges that around May 2014, it stopped receiving the payments due under the Lease Agreement, and that the current balance due under the agreement is at least $115,710. (Id. ¶ 53.) Plaintiff also alleges that SME failed to pay property taxes for the Calexico property and caused a mechanic's lien to be recorded on the property. (Id. ¶¶ 55-

---

[1] Rex alleges that NE Nebraska never occupied the Calexico property, and that SME operated the Burger King from the Lease Agreement's inception. (Doc. No. 43-3 ¶ 11.) NE Nebraska filed articles of dissolution on December 9, 1994. (Doc. No. 43-3 ¶ 12.)
[2] Rex's First Amended Complaint acknowledges that SME vacated the Calexico property after selling it, but the record is silent as to the exact date SME ceased occupancy. SME must have vacated the property in 2012, however, because it filed articles of dissolution in December of that year.

56.) Plaintiff alleges that around late 2014 or early 2015, the Calexico property was abandoned, vandalized, and fixtures were stolen and/or removed from the premises. (Id. ¶ 26.) Plaintiff alleges that the vandalism caused $194,450.00 or more in damages. (Id. ¶ 75.)

## II. Procedural History

On November 19, 2015, Rex filed a complaint against SME, Shennen Saltzman, and Theodore Saltzman, Jr. (former SME officers), alleging causes of action for: (1) breach of written contract against SME; (2) negligence against SME; (3) negligence against Saltzmans and (4) violation of California Corporations Code § 2116 against the Saltzmans. (Doc. No. 1, Compl.) On May 13, 2016, the Court granted Defendants' motion to dismiss the original complaint for failure to state a claim with leave to amend. (Doc. No. 15.)

On June 13, 2016, Rex filed a first amended complaint against the Defendants, alleging the same four causes of action that were contained in the original complaint and adding a claim against SME for breach of implied-in-fact contract. (Doc. No. 16.) On August 29, 2016, the Court dismissed all claims against the Saltzmans, but denied SME's motion to dismiss Rex's alternative claims for breach of written contract and breach of an implied-in-fact contract. (Doc. No. 26.) SME answered Rex's contract claims, and the parties proceeded to discovery.

On September 12, 2017, Rex filed the instant motion for partial summary judgment. (Doc. No. 43.) The parties have completed their briefing on the motion, and the matter is ripe for disposition.

## Discussion

## I. Legal Standards for Summary Judgment

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 if the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986); Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc., 618 F.3d 1025, 1031 (9th Cir. 2010). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Fortune Dynamic, 618 F.3d at 1031 (internal quotation marks and citations omitted); accord Anderson, 477 U.S. at 248. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to establish an essential element of the nonmoving party's case that the nonmoving party bears the burden of proving at trial. Id. at 322–23; Jones v. Williams, 791 F.3d 1023, 1030 (9th Cir. 2015). Once the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to "set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" T.W. Elec. Serv., 809 F.2d at 630 (quoting former Fed. R. Civ. P. 56(e)); accord Horphag Research Ltd. v. Garcia, 475 F.3d 1029, 1035 (9th Cir. 2007). To carry this burden, the non-moving party "may not rest upon mere allegation or denials of his pleadings." Anderson, 477 U.S. at 256; see also Behrens v. Pelletier, 516 U.S. 299, 309 (1996) ("On summary judgment, . . . the plaintiff can no longer rest on the pleadings."). Rather, the nonmoving party "must present affirmative evidence . . . from which a jury might return a verdict in his favor." Anderson, 477 U.S. at 256.

When ruling on a summary judgment motion, the court must view the facts and draw all reasonable inferences in the light most favorable to the non-moving party. Scott v. Harris, 550 U.S. 372, 378 (2007). The court should not weigh the evidence or make credibility determinations. See Anderson, 477 U.S. at 255. "The evidence of the non-movant is to be believed." Id. Further, the Court may consider other materials in the record

not cited to by the parties, but it is not required to do so. See Fed. R. Civ. P. 56(c)(3); Simmons v. Navajo Cnty., 609 F.3d 1011, 1017 (9th Cir. 2010).

## II. Analysis

Rex argues that there is no genuine dispute of material fact that SME breached the 1985 Lease Agreement by failing to pay rent and property taxes at the Calexico property, and by failing to keep the property in good repair. Rex thus seeks summary judgment as to SME's liability. Citing BRE DDR BR Whittwood CA LLC v. Farmers & Merchants Bank of Long Beach, 14 Cal. App. 5th 992 (2017), SME argues that any obligations it had to Rex ended when it vacated Rex's property in 2012, and that therefore SME is not liable for any rent, taxes or property damage that accrued after 2012.

The parties agree that California law governs this dispute. The Ninth Circuit has recently explained that:

> "The task of a federal court in a diversity action is to approximate state law as closely as possible in order to make sure that the vindication of the state right is without discrimination because of the federal forum." Gee v. Tenneco, Inc., 615 F.2d 857, 861 (9th Cir. 1980); accord U.S. Fidelity and Guaranty Co. v. Lee Investments LLC, 641 F.3d 1126, 1133 (9th Cir. 2011) ("Perhaps a better way of putting it is to say that one of the goals in deciding state law questions is to do no harm to state jurisprudence."). "[F]ederal courts are bound by the pronouncements of the state's highest court on applicable state law." Ticknor v. Choice Hotels, Inc., 265 F.3d 931, 939 (9th Cir. 2001). Similarly, a federal court is "not free to reject a state judicial rule of law merely because it has not received the sanction of the state's highest court, but it must ascertain from all available data what the state law is and apply it." Estrella v. Brandt, 682 F.2d 814, 817 (9th Cir. 1982). "An intermediate state appellate court decision is a 'datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'" Id. at 817 (quoting West v. A.T.&T. Co., 311 U.S. 223, 237 (1940)); see also Lewis v. Tel. Empl. Credit Union, 87 F.3d 1537, 1546 (9th Cir. 1996) (citing In re Kirkland, 915 F.2d 1236, 1239 (9th Cir. 1990) to recognize that ". . . where there is no convincing evidence that the state supreme court would decide differently, 'a federal court is obligated to follow the decisions of the state's intermediate appellate courts'").

Kwan v. SanMedica Int'l, 854 F.3d 1088, 1093 (9th Cir. 2017).

Under California law, in order to establish a breach of contract, a party must show: (i) the existence of a contract; (ii) performance by the plaintiff or excuse for nonperformance; (iii) breach by defendant; and (iv) damages. See, e.g., Oasis W. Realty, LLC v. Goldman, 51 Cal. 4th 811, 821 (2011).

There is no dispute in this case that the 1985 Lease Agreement was a valid contract, and that Rex performed its obligations under that contract. Rather, the parties dispute whether SME breached its obligations under the Lease Agreement. SME argues that it was never in full contractual privity with Rex, and thus ceased having any obligations under the Lease Agreement when it vacated the Calexico property. Rex argues that SME became liable for NE Nebraska's obligations under the Lease Agreement. Rex thus argues that SME is responsible for all outstanding rent, property taxes, and upkeep costs associated with the Calexico property from 2012 until the Lease Agreement expired in 2015. The Court will address each of Rex's theories in turn.

### A. Direct Party or Assignee.

Rex first argues that SME became a direct party to the 1985 Lease Agreement by voluntarily accepting the benefits of the lease—use of the Calexico property—and by performing the lease's obligations for more than twenty years.[3] See Cal. Civil Code § 1589 ("A voluntary acceptance of the benefit of a transaction is equivalent to the consent to all the obligations arising from it . . . ."). However, California's statute of frauds provides that real estate lease agreements "for a longer period than one year" are "invalid, unless they, or some note or memorandum thereof, are in writing and subscribed by the party to be charged or by the party's agent." California Civil Code § 1624(a)(3); see also Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners, 52 Cal. App. 4th 867, 877 (1997) ("[W]e hold that an agreement to lease real property for a term exceeding one year is within the statute of frauds . . . regardless whether such agreement provides that it may be canceled or terminated within one year of the date of its making . . . ."). There is no dispute that Rex and SME never signed a written lease with one another.

In the Court's prior order on SME's second motion to dismiss, the Court determined that Rex could state a valid claim notwithstanding the statute of frauds by providing

---

[3] The record is unclear as to when SME took possession of the Calexico property. Rex asserts that SME occupied the property for more than twenty years, but does not give a precise date range for SME's occupancy.

7

3:15-cv-02607-H-JMA

evidence that NE Nebraska assigned the lease to SME by operation of law. (Doc. No. 26 at PageID 312 (citing Maron v. Howard, 258 Cal. App. 2d 473, 484 (1968)).) See also Cal. Civil Code § 1091 ("An estate in real property . . . can be transferred . . . by operation of law, or by an instrument in writing . . . ."). Accordingly, Rex argues that SME became an assignee as a matter of law by occupying the Calexico property for more than two decades, paying rent and property taxes, maintaining the premises, and by holding itself out to third parties as a party to the 1985 Lease Agreement. Rex further argues that SME was obligated as an assignee to perform all of the obligations imposed by the Lease Agreement until it expired in 2015, regardless of when SME vacated the Calexico property.

However, recent developments in California law make clear that Rex's theory is untenable. In BRE DDR BR Whittwood CA LLC v. Farmers & Merchants Bank of Long Beach, 14 Cal. App. 5th 992 (2017),[4] the California Court of Appeal explained that, in the context of commercial real estate lease agreements:

> An assignee's liability to the landlord turns on the nature of the assignment. If the assignee takes possession of the premises but no more, privity of estate exists and he is bound by all lease covenants which run with the land. Upon a subsequent assignment, privity of estate ends and, with it, all obligation to the landlord. If, however, the assignee expressly agrees with the assignor to assume the obligations of the lease, far different consequences attend. The assumption agreement creates a new privity of contract between landlord and assignee, enforceable by the landlord as a third party beneficiary, regardless of whether the landlord was a party to the assumption agreement. As a consequence, the assuming assignee is required to perform all covenants of the lease for the remainder of its term, absent a release by the landlord.
>
> In [Enterprise Leasing Corp. v. Shugart Corp., 231 Cal. App. 3d 737, 746 (1991)], this court found that **there must be an express assumption of the contractual obligations of a real property lease to hold an assignee liable for the lease obligations**. Lease covenants that run with the land bind and inure an assignee only as long as it remains in possession of the premises. As long as he remains in possession the nonassuming lessee is bound to pay the rent, maintain the insurance, make repairs, and pay taxes, if the lease so provides. **However, these obligations terminate when the assignee**

---

[4] The Court is aware that BRE DDR BR, like many of the California cases cited in this order, was not a decision from the California Supreme Court. "However, where there is no convincing evidence that the state supreme court would decide differently, 'a federal court is obligated to follow the decisions of the state's intermediate appellate courts.'" Lewis v. Tel. Empl. Credit Union, 87 F.3d 1537, 1545 (9th Cir. 1996) (quoting In re Kirkland, 915 F.2d 1236, 1239 (9th Cir. 1990)). The Court is aware of no authority from the California Supreme Court that undermines any of the California Court of Appeal decisions cited in this order.

**terminates his possession**.

Id. at 1000 (emphases added; citations and internal quotation marks altered or omitted; footnote omitted). In other words, the Court of Appeal held that merely accepting *assignment* of a real estate lease does not bind a party to a lease's terms beyond the assignee's period of occupancy unless the assignee also *expressly assumes* the lease. Id.

The Court of Appeal then turned to the question of what constitutes an "express assumption." After a lengthy examination of California cases, the court held that an "express assumption of a real property lease requires specific affirmation by the assignee to bind itself to the lease obligations." Id. at 1001. This specific affirmation must be a statement "either orally or in writing that [the assignee] agrees to be bound by the terms of the lease," Kelly v. Tri-Cities Broadcasting, Inc., 147 Cal. App. 3d 666, 678 (1983), because California courts have "declined to impose obligations on an assignee where the assignee did not sign the lease or any document evidencing an acceptance of the lease or its obligations." BBE DDR BR, 14 Cal. App. 5th at 1001 (citing Treff v. Gulko, 214 Cal. 591 (1932)).

The facts of Kelly are particularly instructive. In that case, the defendant purchased a radio station that had been operating on land leased from the plaintiffs. Kelly, 147 Cal. App. 3d at 670. The defendant explicitly acknowledged the lease in its purchase agreement with the radio station, operated on the leased real estate for nine months, paid all relevant property taxes, and named the plaintiffs as additional insureds on its general commercial liability policy. Id. at 672. Nevertheless, the Court of Appeal held that these actions were insufficient "as a matter of law . . . to substantiate the conclusion [that the defendant] had assumed the lease," because there was no evidence that the defendant had ever made an express statement agreeing to be bound by the lease's terms, as opposed to the covenants the lease attached to the leased property. Id. at 676.

The evidence identified by Rex here is similarly deficient. Rex has put forth substantial evidence that SME was aware of the lease, and abided by all lease covenants (such as the obligations to pay rent and property taxes) that ran with the Calexico property.

This evidence is arguably sufficient to show that SME became NE Nebraska's assignee by operation of law sometime after 1985. However, Rex has put forward no evidence that SME or its agents ever made an express statement "either orally or in writing that [SME] agree[d] to be bound by the terms of the lease." Kelly, 147 Cal. App. 3d at 678. In the absence of such a statement, Rex cannot show that SME expressly assumed the Lease Agreement, and thus SME's obligations to Rex ended in 2012 when SME vacated the Calexico property. BBE DDR BR, 14 Cal. App. 5th at 1000; Enterprise, 231 Cal. App. 3d at 746. Since Rex is only seeking damages that accrued after SME vacated the Calexico property, it cannot recover on its assignment theory, because any assignment that may have occurred by operation of law did not bind SME to any of the lease's obligations beyond those covenants that ran with the land.

### B.     Alter Ego.

Rex next argues that the Court should use its equitable powers to bind SME to the 1985 Lease Agreement's terms because SME was the alter ego of NE Nebraska. Under California law, in order to "justify piercing the corporate veil on an alter ego theory in order to hold [one] corporation liable for the acts or omissions of [another], a plaintiff must show that there is such a unity of interest and ownership between the two corporations that their separate personalities no longer exist." Laird v. Capital Cities/ABC Inc., 68 Cal. App. 4th 727, 741 (1998), overruled on other grounds by Reid v. Google, Inc., 50 Cal. 4th 512 (2010); see also Institute of Veterinary Pathology, Inc. v. Cal. Health Labs., Inc., 116 Cal. App. 3d 111, 119–20 (1981) ("[T]he plaintiff must show 'specific manipulative conduct' by the parent toward the subsidiary which 'relegate[s] the latter to the status of merely an instrumentality, agency, conduit or adjunct of the former . . . .'"). The plaintiff must also show that there would "be an inequitable result if the acts in question are treated as those of the corporation alone." Sonora Diamond Corp. v. Superior Court, 83 Cal. App. 4th 523, 538 (2000). "Alter ego liability is not limited to the parent-subsidiary corporate relationship; rather, 'under the single enterprise rule, liability can [also] be found between sister [or affiliated] companies." Troyk v. Farmers Grp., Inc., 171 Cal. App. 4th 1305,

1341 (2009) (quoting Las Palmas Assocs. v. Las Palmas Ctr. Assocs., 235 Cal. App. 3d 1220, 1249 (1991)).

Under California law, because the alter ego doctrine is equitable in nature, "a trial court is empowered to determine alter ego issues." Dow Jones Co. v. Avenel, 151 Cal. App. 3d 144, 149 (1984). In determining whether one corporation is the alter ego of another, "[f]actors for the trial court to consider include the commingling of funds and assets of the two entities, identical equitable ownership in the two entities, use of the same offices and employees, disregard of corporate formalities, identical directors and officers, and use of one as a mere shell or conduit for the affairs of another." Toho-Towa Co., Ltd. v. Morgan Creek Productions, Inc., 217 Cal. App. 4th 1096, 1108–09 (2013) (quoting Troyk, 171 Cal. App. 4th at 1342). "No one characteristic governs, but the courts must look at all the circumstances to determine whether the doctrine should be applied." Sonora Diamond, 83 Cal. App. 4th at 539. "Because it is founded on equitable principles, application of the alter ego [doctrine] 'is not made to depend upon prior decisions involving factual situations which appear to be similar . . . . 'It is the general rule that the conditions under which a corporate entity may be disregarded vary according to the circumstances of each case.'" Toho-Towa, 217 Cal. App. 4th at 1108 (quoting McLoughlin v. L. Bloom Sons Co., Inc., 206 Cal. App. 2d 848, 853 (1962)). "What the formula comes down to, once shorn of verbiage about control, instrumentality, agency, and corporate entity, is that liability is imposed to reach an equitable result." Mesler v. Bragg Mgmt. Co., 39 Cal.3d 290, 301 (1985) (citation and internal quotation marks omitted). "Thus the corporate form will be disregarded only in narrowly defined circumstances and only when the ends of justice so require." Id.

Here, Rex argues that the following factors show that SME and NE Nebraska were alter egos: (i) the two companies shared common officers and directors; (ii) former SME director Ronald Eriksen negotiated the 1985 Lease Agreement with Rex; (iii) NE Nebraska was a "holding company" that dissolved in 1994, well before the expiration of the Lease Agreement's twenty-year term; and (iv) SME functionally performed all of NE Nebraska's

obligations under the Lease Agreement. (Doc. No. 43 at PageID 481.)

Nevertheless, even crediting all of the facts alleged by Rex, the Court declines to invoke the alter ego doctrine. Rex has not shown "undercapitalization, commingled funds or disregard for corporate formalities," or any other circumstances showing that this is one of the cases where use of the doctrine is appropriate. See Wady v. Provident Life & Accident Ins. Co. of Am., 216 F. Supp. 2d 1060, 1068–69 (C.D. Cal. 2002) (collecting cases rejecting the alter ego doctrine despite overlap in corporate finances, decision-making, or key personnel); Tomaselli v. Transamerica Ins. Co., 25 Cal. App. 4th 1269, 1285 (1994) (declining to invoke the alter ego doctrine in spite of intermingling corporate financial arrangements and the two companies holding themselves out as one entity). At best, Rex's evidence shows that NE Nebraska negotiated the 1985 Lease Agreement with the intent that SME would use the Calexico property and pay the rent. There is nothing uncommon or nefarious in this arrangement.

Moreover, it would be inequitable to disregard the corporate veil under the circumstances present here. Rex could have insisted that SME sign the Lease Agreement if it wished to continue to occupy the Calexico property, and had the power to void the agreement if SME refused. (Doc. No. 16-1 at PageID 148). See also BRE DDR BR, 14 Cal. App. 5th at 1004 (declining to hold purported assignee to lease's terms where the plaintiff, "as a signatory to the initial lease, was in the best position to protect itself by including provisions in the least requiring consent and assumption"). The Court will not invoke its equitable powers to remedy Rex's failure to diligently protect its rights.

C. Modification.

Next, Rex argues that the parties executed an oral modification to the 1985 Lease Agreement at its inception that substituted SME as a party to the lease in NE Nebraska's place. This argument also fails. First, Rex has put forward no evidence of this oral agreement, beyond the fact that SME took possession of the Calexico property and paid the rent during much of the life of the lease. Under California law, while this evidence is sufficient to demonstrate privity of estate and make SME liable for covenants running with

the land during the time of SME's occupancy, it is insufficient to show privity of contract. BRE DDR BR, 14 Cal. App. 5th at 1000. Second, the purported modification was not in writing, and therefore does not satisfy the statute of frauds. See Cal. Civil Code § 1698(c) ("The statute of frauds (Section 1624) is required to be satisfied if the contract as modified is within its provisions."); Secrest v. Sec. Nat'l Mortg. Loan Tr. 2002-2, 167 Cal. App. 4th 544, 553 (2008) ("An agreement to modify a contract that is subject to the statute of frauds is also subject to the statute of frauds."). Finally, the 1985 Lease Agreement itself renders all oral modifications invalid. (Doc. No. 16-1 at PageID 152 ("No modification . . . of this Lease shall be binding unless in writing and executed by the parties hereto, their heirs, successors or assigns.")). Accordingly, Rex's modification theory also failed to demonstrate a basis for binding SME to the Lease Agreement's Terms.

### D. Implied-In-Fact Contract.

Finally, Rex argues that it and SME entered into an implied-in-fact lease agreement with the same terms as the 1985 Agreement with NE Nebraska, and that SME breached the terms of this lease. An implied-in-fact contract is an agreement whose terms are manifested by conduct rather than words. See Pac. Bay Recovery, Inc. v. Cal. Physicians' Servs., Inc., 12 Cal. App. 5th 200, 215 (2017) (explaining the difference between express and implied-in-fact contracts). Rex points to the same core facts in support of this argument that it used in other arguments: (i) NE Nebraska intended that SME would perform its obligations under the Lease Agreement; (ii) SME paid rent and property taxes for more than twenty years; and (iii) SME held itself out to third parties as a party to the Lease Agreement.[5]

Rex's implied-in-fact contract theory suffers from a fundamental problem: implied-in-fact contracts are invalid to the extent they violate the statute of frauds. See Buckaloo v. Johnson, 14 Cal. 3d 815, 821 (1975) ("Any action . . . based on implied contract must

---

[5] The arrangement Rex alleges more closely resembles a novation substituting SME as a party to the Lease Agreement in place of NE Nebraska than an implied-in-fact contract between Rex and SME, because Rex could not have promised exclusive use of the Calexico property to SME without breaching its lease with NE Nebraska. Presumably, Rex does not mean to argue that it simultaneously had an express lease with NE Nebraska and an implied-in-fact lease with SME covering the same property.

fail for want of compliance with the statute of frauds."), overruled on other grounds by Della Penna v. Toyota Motor Sales, U.S.A., Inc., 11 Cal. 4th 376 (1995); Colbaugh v. Hartline, 29 Cal. App. 4th 1516, 1524 (1994). As the Court has already explained, any lease between the parties—express or implied—for a term of twenty years must have been in writing. Cal. Civil Code § 1624(a)(3). It is undisputed that no such written lease exists.

In the Court's prior order on SME's second motion to dismiss, the Court ruled that Rex could proceed on an implied-in-fact contract theory notwithstanding the statute of frauds by invoking the doctrine of equitable estoppel. (Doc. No. 26 at PageID 317 (citing Chavez v. Indymac Mortg. Servs., 219 Cal. App. 4th 1052, 1058 (2013).) However, Rex chose not to develop an equitable estoppel theory in its briefing. Accordingly, the Court concludes that Rex's implied-in-fact contract theory is barred by the statute of frauds.

## **Conclusion**

Rex has failed to show a genuine dispute of material fact that SME breached any obligation to Rex under the 1985 Lease Agreement, and therefore not only is Rex not entitled to judgment as a matter of law, it has not demonstrated any basis for proceeding to trial. Nor can Rex materially strengthen its claims at this stage of the proceedings, as the parties have already completed discovery.

Federal Rule of Civil Procedure 56(f)(1) permits courts to "grant summary judgment for a nonmovant" after "giving notice and a reasonable time to respond." However, "a court may grant summary judgment without notice if the losing party has had a 'full and fair opportunity to ventilate the issues involved in the motion.'" In re Rothery, 143 F.3d 546, 549 (9th Cir. 1998) (quoting In re Harris Pine Mills, 44 F.3d 1431, 1439 (9th Cir. 1995)); see also Celotex, 477 U.S. at 326 ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments sua sponte, so long as the losing party was on notice that she had to come forward with all of her evidence."); Acton v. City of Columbia, 436 F.3d 969, 975 n.5 (8th Cir. 2006) ("A district court maintains the discretion to grant a non-moving party summary judgment, even where the nonmovant does not file a cross-motion for summary judgment.").

The Court gave notice that it was considering treating SME's opposition as a cross-motion for summary judgment on each of Rex's remaining causes of action on October 13, 2017. (Doc. No. 48.) Rex filed a reply brief on October 16, 2017, in which it attempted to distinguish BRE DDR BR on its facts, but did not address that case's central holding that an assignee's liability for a lease of real property terminates when the assignee vacates the property, unless the assignee makes an express oral or written statement agreeing to assume the lease. (Doc. No. 49.) The Court also heard argument on this motion on October 23, 2017. The Court concludes that Rex was given a reasonable time to respond to SME's opposition brief, and that "[d]elaying a ruling until Defendants file a formal motion for summary judgment would serve no purpose." Allen v. Honeywell Ret. Earnings Plan, 382 F. Supp. 2d 1139, 1165 (D. Ariz. 2005). The Court accordingly grants summary judgment in favor of SME, and directs the Clerk of the Court to close this case and enter judgment in favor of the Defendants. See English & Sons, Inc. v. Straw Hat Restaurants, Inc., 176 F. Supp. 3d 904, 919 n.59 (N.D. Cal. 2016) (granting summary judgment to defendants sua sponte where it "follow[ed] necessarily from the court's analysis of the plaintiffs' motion" that summary judgment was appropriate).

**IT IS SO ORDERED.**

DATED: October 23, 2017

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT